#### IN THE UNITED STATES DISTRICT COURT FOR THE
#### EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AGSHIN MIRZAYEV,<br><br>*Defendant.* | Criminal No. 1:23-MJ-190 |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Gloria Elizabeth Tabaczyk, being duly sworn, hereby, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 5, 2022. Currently, I am assigned to a squad that investigates organized criminal enterprises and is based at the Washington Field Office – Northern Virginia Resident Agency in Manassas, Virginia. I have a bachelor's degree in Criminal Justice. Prior to joining the FBI, I obtained the rank of Sergeant with the United States Secret Service Uniformed Division. During my time with the Federal Bureau of Investigation, I have primarily assisted in the investigation of violations of fraud and money laundering, such as online or telephonic scams, and bank card skimming schemes. I have investigated and assisted in the investigation of criminal matters involving violations of Federal criminal statutes that involve financial institutions; the investigation of complex financial crimes, including document review, analysis, and interviews; and the execution of arrest and search warrants. The facts and information contained in this affidavit are based on my personal knowledge of the investigation, my training

1

and experience, the observations and reports of other law-enforcement officers, and information obtained from other agents, and witnesses, including by a Special Agent of the U.S. Department of Labor, Office of Inspector General, who is a subject matter expert in pandemic-era unemployment insurance fraud investigations. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge or all facts known to the United States about this investigation.

2. I make this affidavit in support of a criminal complaint against and arrest warrant for, AGSHIN MIRZAYEV ("MIRZAYEV") for violations of 18 U.S.C § 1343 Wire Fraud.

## PROBABLE CAUSE

**The Economic Injury Disaster Loan**

3. The United States Small Business Administration ("SBA") is an executive branch agency of the United States Government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small business and by assisting in the economic recovery of communities after disaster.

4. The Economic Injury Disaster Loan ("EIDL") is administered by the SBA. The SBA provides these loans to qualifying businesses located in declared disaster areas that have suffered substantial economic injury, to include small businesses, small agricultural cooperatives, and most private nonprofit organizations.

5. Substantial economic injury means the business is unable to meet its obligations and to pay its ordinary and necessary operating expenses. EIDLs provide the necessary working capital to help small businesses survive until normal operations resume after a disaster.

6. The SBA can provide up to $2 million to qualified applicants to help meet financial obligations and operating expenses that could have been met had the disaster not occurred. Loan amounts are based on actual economic injury and a company's financial needs.

7. EIDL assistance is available only to small businesses when SBA determines they are unable to obtain credit elsewhere.

8. To obtain an EIDL, a representative of a qualifying business has to submit the completed loan application and a signed and dated IRS Form 4506-C, giving the Internal Revenue Service ("IRS") permission to provide the SBA tax return information.

**The Paycheck Protection Program**

9. The Paycheck Protection Program ("PPP") was a Coronavirus ("COVID-19") pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable, and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

10. To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to

provide documentation showing its payroll expenses, such as filed federal income tax documents.

11. PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located in either Virginia or Oregon. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

12. The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

13. While this "first draw" PPP program ended on May 31, 2021, certain borrowers were eligible to apply for "second draw" PPP loans. Eligible borrowers included business that had no more than 300 employees; had previously received a PPP loan and would, or had already, used the full amount only for authorized uses; and could demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. Second draw PPP loans were approved with the same general loan terms as the first draw PPP loans.

**Virginia Unemployment Insurance Program**

14. Following the emergence of the novel COVID-19, the United States government took steps to slow the spread of the virus and to mitigate its impact on the public's health and economic wellbeing.

15. On March 13, 2020, President Donald J. Trump declared the COVID-19 pandemic to be an emergency under Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act").

16. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT") was signed into law. The CARES Act created the Pandemic Unemployment Assistance ("PUA") program, which provided unemployment benefits to individuals not eligible for regular unemployment compensation or extended unemployment benefits. The most notable feature of the PUA program was that it greatly expanded and made government unemployment benefits available to self-employed, gig, or contract workers for the first time in history. The PUA program ended in September 2021.

17. The CARES Act also provided for an emergency increase in unemployment compensation benefits, referred to as Federal Pandemic Unemployment Compensation ("FPUC"). FPUC provided eligible individuals with $600.00 per week in addition to the weekly benefit amount they received from certain other unemployment compensation programs, to include PUA.

18. As of April 18, 2020, the President declared that a major disaster existed in all states and territories under Section 401 of the Stafford Act. On August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Fund for lost wage payments. The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving unemployment insurance.

19. The PUA, FPUC, and LWA programs were administered by the various states,

including the Commonwealth of Virginia, but those programs' benefits were funded by the federal government, with program administration and oversight by the U.S. Department of Labor and/or the U.S. Department of Homeland Security.

20. Unemployment Insurance ("UI") is a joint state-federal program intended to provide temporary financial assistance to unemployed workers under certain circumstances. The Federal Unemployment Trust Fund provides support and funding for state UI programs. For instance, during periods of high unemployment, the federal government provides partial funding to states for payment of extended benefits to UI recipients. States can also borrow from the Federal UI Fund if their own funds are insufficient.

21. The Commonwealth of Virginia managed its unemployment insurance compensation program through the Virginia Employment Commission ("VEC"). Under normal circumstances, eligible Virginia UI recipients receive a minimum of $158.00 per week.

22. In the wake of the COVID-19 pandemic, the PUA and FPUC programs increased weekly benefits for Virginia UI recipients to a minimum of $758.00 per week.

23. To be eligible for Virginia UI benefits, claimants must have had their hours reduced by their employer or been separated from employment altogether, including during operation of the PUA program, due to business closures or other reasons related to COVID-19.  Once the VEC approves a claim, the claimant must re-certify unemployment status on a weekly basis. Specifically, claimants must certify that they are ready, willing, and able to work each day during the weeks they are claiming UI benefits. During some periods of operation of the PUA program, claimants were exempt from additional job search requirements for reasons related to COVID-19. Claimants in all cases were required to report weekly income received from any employment activity and from other sources, such as paid leave, pensions, disability payments, loan

disbursements, and other sources. In order to establish the claimant's monetary eligibility to receive benefits for a particular week, the VEC relied on accurate and truthful representations regarding a claimant's weekly employment status and earned income from any source. For instance, if a claimant reported income or loan proceeds received in a particular week that totaled more than the claimant's ordinary weekly benefit amount, the VEC might offset or otherwise not pay benefits at all for that particular week.

24. Prior to February 2022, when a weekly certification was made and cleared for payment, an ACH file was sent from the VEC server in Sandston, Virginia, to a SunTrust Bank Server located in Atlanta, Georgia. After February 2022, the files were sent to a Truist Bank server located at the Zebulon Data center near Raleigh, North Carolina. A backup server was located in Charlotte, North Carolina. When the file was received, Truist Bank or SunTrust Bank were instructed to release money from the VEC Trust Fund Account to a VEC Payments Account. The electronic transfers were initiated by Truist Bank or SunTrust Bank to the ACH claimant direct deposit account on file as detailed on the original ACH File. The electronic messages and signals related to these transactions were conducted in a manner affecting interstate commerce.

25. Applicants could choose whether to have the VEC deposit their unemployment benefits directly into a linked bank account specified by the claimant during the initial UI application process, or loaded onto a prepaid debit card (called "Way 2 Go" cards), which is shipped to the applicant via the United States Postal Service to the physical address listed on the application. For applicants who choose a debit card, a personal identification number for the card is sent to the address listed on the application in a separate mailing.  Prepaid cards are automatically reloaded with newly dispersed funds via electric transfers using the internet.

## The Scheme and Artifice

26. The subject of this warrant, Agshin Mirzayev ("MIRZAYEV"), devised a scheme and artifice to enrich himself by fraudulently obtaining COVID-19 relief funds and other economic disaster relief through the submission of misleading applications to financial institutions, the SBA, and the VEC.

### MIRZAYEV is gainfully employed by ACTION MOVING, LLC

27. According to the Virginia State Corporation Commission ("SCC") Clerk's Information System, a company called Action Moving LLC ("ACTION MOVING") was formed on or about February 20, 2018, by Registered Agent MIRZAYEV.

28. According to information provided to the FBI by the United States Department of Transportation ("USDOT"), ACTION MOVING has two DOT numbers associated with the company. The first DOT number, 3298587, granted July 22, 2019, certifies freight forwarding authority, and the second DOT number, 3545050, granted January 27, 2021, certifies carrier operating authority.

29. I know Yelp Inc. ("Yelp") to be a publishing platform of crowd-sourced business reviews. As part of my investigation, I have reviewed the public yelp.com website of ACTION MOVING. The "about the business" section of the website describes the company as a Northern Virginia-based household moving and interstate transportation service established in 2015, owned by Agshin M. ACTION MOVING received over 10 reviews from customers during the period of March 2020 to May 2021.

30. ACTION MOVING opened a business account, with account number ending in 1776 ("Account x1776"), at BB&T Bank ("BB&T") and maintains that account with Truist Bank ("Truist"), the successor to BB&T. Based on records received by BB&T, I know that, on or about January 2, 2020, MIRZAYEV signed the "BB&T Resolution and Agreement for Deposit Account" for Account x1776 as the Designated Representative (Owner) of the Limited Liability Entity ACTION MOVING, LLC, EIN 824485434. (See Figure A).

FIGURE A

31. Based on information obtained by law enforcement from Truist, I know that MIRZAYEV deposits cash and checks from customers of ACTION MOVING into account x1776. Based on account statements of Account x1776 obtained from Truist, approximately $144,050.00 was deposited into Account x1776 between March 2020 and May 2021 (not

including economic injury loan assistance). These funds were deposited into Account x1776 in 121 separate transactions, some in cash and some in checks paid to the order of ACTION MOVING. A majority of the check memo lines state "moving" or something similar. (See Figures B and C for a sample of checks deposited to Account x1776).



FIGURE B



FIGURE C

**MIRZAYEV submits application for Unemployment Benefits to the Virginia Unemployment Commission (VEC)**

32. As part of the scheme and artifice, MIRZAYEV submitted a fraudulent PUA/UI application to the VEC on or about May 29, 2020 to obtain unemployment benefits to which he was not entitled due to the income he was receiving through ACTION MOVING.

33. On his PUA/UI application to the VEC, MIRZAYEV made several materially false representations about his unemployment history and employment status, including, but not limited to, the following:

    A. Despite owning and operating ACTION MOVING at the time, MIRZAYEV falsely claimed to the VEC that he was terminated from ACTION MOVING on March 16, 2020, giving rise to his need for PUA/UI benefits. (See Figure D).

11

**Certification**

I certify that all of the information I have given on this application is correct, and that I

/www.vec.virginiainteractive.org/admin/pua_admin.cgi?trans_id=pa20149193236ce7d01&rfid=qa2229712143218df101          3

'22, 8:56 AM                                                                                                              PUA Initial Claim Admin Site

have submitted this information in order to obtain Pandemic Unemployment Assistance (PUA). I declare under penalty of perjury that the citizenship/alien status information on this form is true and correct. I understand that Federal funds are provided and that the law provides for fines or imprisonment or both in addition to disqualification of benefits if I knowingly fail to disclose information or give false information in order to obtain or increase PUA benefits to which I am not entitled. I am furnishing my Social Security Number as required under 28 U.S.C 5109(d) for the purposes of reporting PUA as Federal income and for determining my entitlement to PUA. I understand, in accordance with 20 CFR 625, that information concerning my PUA application may be disclosed only as is allowed with respect to regular compensation under state law and to the U.S. Department of Labor.

Do you wish to continue and submit this claim? **Yes**

FIGURE D

34. Before submitting the application to the VEC, MIRZAYEV certified that the information on the application was true to the best of his knowledge, and he agreed to file the application with the understanding that he could be fined and/or imprisoned if he knowingly failed to disclose information or gave false information in order to obtain or increase benefits. (See Figure E).

**Position**

Type of employment: **Contract**
Full or part-time: **Full Time (30 Hours or More)**
Whole Hours: **Over 40**
Partial Hours: **.00**
Gross Salary: **$1,000.00**
Salary is based upon: **Week**
Salary is commission-based: **Yes**
Date you began work: **02/20/2018**
Are you currently employed with this employer? **No**
Gross earnings this week: **$ 0.00**
Number of hours worked this week: **0**
Reason for Separation: **Laid off / Reduction in Force**
Last day worked: **03/16/2020**
Does the employer intend to recall you within 6 weeks? If unknown select No. **No**
Were you separated from this job because you had family responsibilities that you had to attend to? **No**
Was this employment with an educational institution? **No**
Are you a corporate officer or a relative of a corporate officer? **No**
Were you separated from this job because of lack of transportation? **No**
Job duties: **TECHNICIAN**

FIGURE E

35. Relying on the false information MIRZAYEV submitted in his PUA application, the VEC approved the application, to include backpay to March 15, 2020, and the VEC began dispersing benefit payments into MIRZAYEV's designated bank account (BB&T/Truist account ending in 0523, "Account x0523") on June 4, 2020.

36. It was further part of the scheme and artifice that MIRZAYEV would submit weekly recertifications of unemployment status to the VEC for the PUA/UI application he submitted, resulting in the dispersal of additional weekly benefit payments into his Account x0523. On these recertifications MIRZAYEV claimed that he was still unemployed, when, in fact, he was operating and self-employed at ACTION MOVING. (See Figure F showing one of the weekly recertification forms submitted by MIRZAYEV while he was operating ACTION MOVING).

**Claimant Information**

| | |
|---|---|
| Social Security Number | 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 |
| Claimant's Name | AGSHIN O MIRZAYEV |

**Claim Questions**

| | Answer |
|---|---|
| Did you perform any work or engage in any self-employment for the week ending 05/01/2021? | No |

If you have a definite return to work date, provide it here:

For the week ending 05/01/2021, did you apply for or receive any of the following?

| Name | Answer | Amount |
|---|---|---|
| Illness or Disability Insurance | No | |
| Unemployment Benefits | No | |
| Private Income Protection Insurance | No | |
| Retirement Pension or Annuity | No | |
| Trade Readjustment Allowances | No | |
| Paid Sick Leave or Other Paid Leave | No | |
| Paycheck Protection Program (PPP) Funds | No | |
| Other Monetary Compensation | No | |
| Other | No | |

| | |
|---|---|
| Were you able and available for work during the week ending 05/01/2021? | Yes |
| Did you accept all work offered during the week ending 05/01/2021? | Yes |

FIGURE F

13

37. Account statements provided to law enforcement by Truist confirm that, due to the false weekly recertifications that MIRZAYEV submitted to the VEC, he continued to receive PUA/UI benefits from the VEC via direct deposit into Account x0523 between June 4, 2020 and June 1, 2021, for a total of $28,238.00. (See Figure G showing the first PUA/UI benefits MIRZAYEV received in 2020).

**Deposits, credits and interest**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/04 | UI BENEFIT VEC - VIRGINIA 0731 MIRZAYEV/AGSHIN O | 7,138.00 |
| 06/08 | ZELLE REVERSAL Tural Move Seki PAYMENT ID   BBT031926683 | 100.00 |
| 06/10 | UI BENEFIT VEC - VIRGINIA 0731 MIRZAYEV/AGSHIN O | 758.00 |
| 06/17 | UI BENEFIT VEC - VIRGINIA 0731 MIRZAYEV/AGSHIN O | 758.00 |
| 06/24 | UI BENEFIT VEC - VIRGINIA 0731 MIRZAYEV/AGSHIN O | 758.00 |
| **Total deposits, credits and interest** | | **= $9,512.00** |

FIGURE G

38. Another fraudulent aspect of the aforementioned weekly recertifications is the fact that MIRZAYEV continued to certify that he had not received any PPP funds, even after he received a PPP loan in early May 2021. (See Figure F above).

39. In addition, according to Claimant Payment Information provided to law enforcement by the VEC, on or about October 15, 2020, MIRZAYEV received a VEC payment of $1,800.00. That transaction represented a one-time payment of the FEMA Lost Wage Assistance, or LWA funds described above, for a six-week period, at a rate of $300 per week. (See Figure H). Because these LWA funds were only available to those who qualified for PUA/UI benefits, MIRZAYEV was only able to receive these funds because of his PUA/UI fraud.

```
10/25/22                       ACH PAYMENT HISTORY

  SSN: 697 14 7545                                    STATUS: SETUP ON

    TRACE NUMBER      PAYMENT AMT    ACCOUNT NUMBER   PAYMENT DATE   METHOD

    202102086675897     $458.00          40523         02/08/2021    DEPOSIT
    202102016500118    $2290.00          40523         02/01/2021    DEPOSIT
    202012145535422     $158.00          40523         12/14/2020    DEPOSIT
    202012075268042     $158.00          40523         12/07/2020    DEPOSIT
    202011305013195     $158.00          40523         11/30/2020    DEPOSIT
    202011234765278     $158.00          40523         11/23/2020    DEPOSIT
    202011164487355     $158.00          40523         11/16/2020    DEPOSIT
    202011094206033     $158.00          40523         11/09/2020    DEPOSIT
    202011023919695     $158.00          40523         11/02/2020    DEPOSIT
    202010263621315     $158.00          40523         10/26/2020    DEPOSIT
    202010193296438     $158.00          40523         10/19/2020    DEPOSIT
    202010153025234    $1800.00          40523         10/15/2020    DEPOSIT
    202010132714042     $158.00          40523         10/13/2020    DEPOSIT
    202010052407094     $158.00          40523         10/05/2020    DEPOSIT
    202009282098250     $158.00          40523         09/28/2020    DEPOSIT

    PF7=PAGE BACKWARD; PF8=PAGE FORWARD
```

FIGURE H

40. MIRZAYEV did knowingly and with intent to defraud violate 18 U.S.C. § 1343 Wire Fraud by receiving unemployment benefits for a period of 61 weeks despite being gainfully employed by ACTION MOVING.

**MIRZAYEV applies for Economic Injury Disaster Loan (EIDL)**

41. It was further part of the scheme and artifice that MIRZAYEV submitted a EIDL application to the SBA to obtain disaster assistance benefits he was not eligible to receive.

42. The details of MIRZAYEV's EIDL application were voluntarily provided to the FBI by the Treasury Inspector General for Tax Administration ("TIGTA"). The documents revealed that, on or about June 26, 2020, MIRZAYEV submitted an EIDL application to the SBA. MIRZAYEV's application was approved on or about June 26, 2020. Advance funds in the amount of $3,000.00 were deposited into ACTION MOVING's Account x1776 on or about June 30, 2020. (See Figure I). Proof of the loan deposit into Account x1776 was confirmed by information provided to law enforcement by Truist. The remainder of the approved funds in the amount of $55,000.00 were deposited on July 7, 2020, to Account x1776. (See Figure J).



FIGURE I

16



FIGURE J

43. A 2019 IRS Form Schedule C Form 1040 or 1040 SR Profit or Loss from Business (Sole Proprietorship) claims that ACTION MOVING is a sole proprietorship with MIRZAYEV as its employee, and owner.

44. When signing the Loan Authorization Agreement ("LAA") on July 3, 2020, MIRZAYEV certified as the Borrower: "No claim or application for any other compensation for disaster losses has been submitted to or requested of any source and no such other compensation has been received, other than that which Borrower has fully disclosed to SBA."

45. MIRZAYEV was receiving PUA and EIDL assistance simultaneously and failed to report the joint receipt of EIDL and PUA to the Commonwealth of Virginia and the SBA. Additionally, MIRZAYEV, as the Borrower, acknowledged the civil and criminal penalties for misapplication of the proceeds of an SBA disaster loan. (See Figure K).

**ENFORCEABILITY**

- This Loan Authorization and Agreement is legally binding, enforceable and approved upon Borrower's signature, the SBA's approval and the Loan Proceeds being issued to Borrower by a government issued check or by electronic debit of the Loan Proceeds to Borrower' banking account provided by Borrower in application for this Loan.



James E. Rivera
Associate Administrator
U.S. Small Business Administration

The undersigned agree(s) to be bound by the terms and conditions herein during the term of this Loan, and further agree(s) that no provision stated herein will be waived without prior written consent of SBA. **Under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency.**

ACTION MOVING LLC

DocuSigned by: AGSHIN MIRZAYEV
0CAC2C886A12438...

Date: 07.03.2020

AGSHIN MIRZAYEV, Owner/Officer

Note: Corporate Borrowers must execute Loan Authorization and Agreement in corporate name, by a duly authorized officer. Partnership Borrowers must execute in firm name, together with signature of a general partner. Limited Liability entities must execute in the entity name by the signature of the authorized managing person.

FIGURE K

46. MIRZAYEV did knowingly and with intent to defraud violate 18 U.S.C. § 1343 Wire Fraud due to his failure to report joint receipt of unemployment benefits and EIDL funds to the Commonwealth of Virginia.

## CONCLUSION

47. I respectfully submit that this affidavit supports probable cause to believe that, from on or about May 29, 2020, to June 1, 2021, in the Eastern District of Virginia and elsewhere, AGSHIN MIRZAYEV did knowingly and with intent to defraud the Federal Government of the

United States submit fraudulent documents to the SBA and the VEC seeking funds through the EIDL and UI programs despite being gainfully employed at ACTION MOVING, LLC.

Respectfully submitted,

_____
Gloria Elizabeth Tabaczyk
Special Agent
Federal Bureau of Investigation

Reviewed by:   Jordan Harvey, Assistant United States Attorney

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 on this 10th day of October, 2023.

*Lindsey Vaala*
Digitally signed by Lindsey Vaala
Date: 2023.10.10 15:55:22 -04'00'

_____
Honorable Lindsey R. Vaala
United States Magistrate Judge

19